Filed 4/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re D.W., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> D.W., <br><br> Defendant and Appellant. | A141217 <br><br> (Contra Costa County Super. Ct. No. J1000763) |

**I.**

**INTRODUCTION**

D.W. appeals from an order continuing him as a ward of the court. (Welf. & Inst. Code, § 602.) He contends that the juvenile court violated his constitutional right to due process by permitting an amendment to the wardship petition during a contested jurisdiction hearing which added a charge that D.W. committed a battery with injury on a peace officer while he was detained at juvenile hall. (Pen. Code, §§ 242, 243, subd. (c)(2).)[1] D.W. also contends there is insufficient evidence to support the court's finding that he committed that offense.

As we will explain, the amendment to the wardship petition did not violate D.W.'s due process rights, but the record does not contain substantial evidence that the battery D.W. committed caused an injury as that term is defined by the pertinent statute.

_____

[1] All statutory references are to the Penal Code unless otherwise stated.

1

(§ 243, subd. (f)(5).) Therefore, we will modify the appealed order to reflect that D.W. committed a battery against a peace officer. (§ 243, subd. (b).)

## II.

## STATEMENT OF FACTS

### A. Background

In May 2010, the Contra Costa County District Attorney filed an original wardship petition charging 13-year-old D.W. with misdemeanor battery on a school employee and two counts of making criminal threats. That November, D.W. was adjudged a ward of the court after he admitted the battery in exchange for dismissal of the threat charges. The court ordered probation and placed D.W. in a group home. In 2011 and 2012, D.W. committed several probation violations necessitating new placements and was also the subject of a Stanislaus County wardship petition charging him with vehicle theft and driving without a license.

In January 2013, the juvenile court ordered that D.W. be screened for the Youth Offender Treatment Program (YOTP). In April, the court filed a disposition order placing D.W. in YOTP for a period not to exceed two years 244 days, or until age 21, whichever occurred first. This court affirmed the YOTP placement order in an unpublished decision filed on September 30, 2013. (*In re D.W.* (Sept. 30, 2013, A138467) [nonpub.opn.].)

### B. The Second Supplemental Petition

Meanwhile, in May 2013, the Contra Costa County District Attorney filed an amended second supplemental petition against D.W. Count one of the petition alleged that D.W.'s adoptive parents were unable to accept responsibility for housing and raising him, a fact D.W. had previously admitted. However, the District Attorney added two new charges arising out of an incident that occurred on February 12, 2013, while D.W. was detained at juvenile hall. Count two of the amended second supplemental petition charged D.W. with felony battery by gassing on the person of Robert Dutra, an employee

of the juvenile hall detention facility, in violation of section 243.9.[2] Count three charged D.W. with felony possession of a dirk or dagger in violation of section 21310.[3]

A contested jurisdiction hearing on the amended second supplemental petition was set for September 23, 2013. At the beginning of that hearing, the juvenile court took judicial notice of a February 2013 order detaining D.W. at juvenile hall pending disposition of the first supplemental petition (which resulted in the YOTP placement). The People then requested that the court take judicial notice that juvenile hall is a "local detention facility" within the meaning of section 243.9. However, D.W. objected to that request, arguing that the nature of the facility was an element of the offense of battery by gassing, which the People had to prove. After lengthy discussion, the court denied the request for judicial notice and advised the parties that its "inclination" was to dismiss the section 243.9 charge because the People would not be able to prove that juvenile hall is a local detention facility "based on the definition in the Penal Code." Instead though, the court continued the hearing so the parties could brief the issue. The contested jurisdiction hearing was continued to October 21, 2013.

On October 3, 2013, the People filed a motion for permission to file a second amended second supplemental petition which added another charge arising out of the

---

[2] Section 243.9 states in relevant part: "(a) Every person confined in any local detention facility who commits a battery by gassing upon the person of any peace officer. . . or employee of the local detention facility is guilty of aggravated battery and shall be punished by imprisonment in a county jail or by imprisonment in the state prison for two, three, or four years. [¶] (b) For purposes of this section, 'gassing' means intentionally placing or throwing, or causing to be placed or thrown, upon the person of another, any human excrement or other bodily fluids or bodily substances or any mixture containing human excrement or other bodily fluids or bodily substances that results in actual contact with the person's skin or membranes."

[3] Section 21310 states in relevant part that "any person in this state who carries concealed upon the person any dirk or dagger is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."

3

February 12 incident. The additional charge was for committing a felony battery with injury on a peace officer in violation of section 243, subdivision (c).[4]

At the October 21 continued hearing, the People conceded that section 243.9 "defines local detention facility as only an adult facility" and moved to dismiss the count charging D.W. with committing a battery by gassing. The juvenile court granted the motion to dismiss and then turned its attention to the motion to amend the second supplemental petition to charge D.W. with committing a battery with injury against a peace officer. The defense objected on two grounds. First, it argued the amendment would violate double jeopardy because the trial had already commenced. Second, D.W. argued that the amendment would violate his right to procedural due process because he had no prior notice of an injury occurring during the February 12 incident.

The court overruled both defense objections and granted the motion to amend the second supplemental petition. With respect to the due process objection, the court found that D.W. had notice of the proposed amendment and "as long as there's no surprise, there's no basic due process violation . . . ." To make a clear record, the court confirmed that the defense received notice of the motion to amend on October 3, and also stated that the defense would be granted additional time to prepare for the new charge. However, when D.W.'s trial counsel continued to object, the court agreed to reconsider its ruling if the defense wanted to brief the matter. In the meantime, the contested hearing was continued until November 18.

On November 6, 2013, D.W. filed a motion to dismiss the battery with injury count on the grounds that (1) D.W.'s liberty had once been in jeopardy for that same offense; and (2) section 654 barred multiple prosecutions for the same offense. At the November 18 hearing, the court denied the motion to dismiss and continued the

---

[4] Section 243, subdivision (c) states that a battery is punishable by a $10,000 fine and up to three years in state prison when it is committed against a peace officer engaged in the performance of his/her duties and an injury is inflicted on that victim. (§ 243, subd. (c)(2).) "Injury" is defined as "any physical injury which requires professional medical treatment." (§ 243, subd. (f)(5).)

4

jurisdiction hearing to December 17, 2013. On December 17, the hearing was continued again.

### C. The Evidentiary Hearing

The evidence portion of the contested jurisdiction hearing was conducted on December 23, 2013. Three Contra Costa County Juvenile Hall employees testified about an incident involving D.W. which occurred at the facility earlier that year.

Probation counselor James Slay testified that, on the morning of February 12, 2013, D.W. was agitated because he thought there was glass in his arm and he could not be convinced otherwise by Slay or a nurse who tried to assist him. Finally, Slay called "a code" because D.W. was hurting himself trying to get inside of his skin. During that code, Slay and other officers recovered a "shank" that D.W. had in his room. A short time later, at approximately 12:02 p.m., Slay was conducting a "15 minute security room check" when D.W. showed him another shank. Slay asked for the object but D.W. refused to give it to him, so Slay had to call another code to the unit. Approximately 10 staff members responded to the call, including Cameron Marshall and R.J. Dutra.

Officer Marshall testified that when he responded to the second code call from Slay, he asked D.W. for the shank but D.W. denied having one. Staff members spent approximately 20 minutes trying to convince D.W. to surrender the shank before they obtained permission to use force. The officers sprayed "OC pepper spray" into the room and directed D.W. to lie on his stomach and crawl out. D.W. refused to comply with that directive, so the door was closed and the officers waited for the pepper spray to take effect. When D.W. finally crawled out of the room, he resisted handcuffs. Eventually, D.W. was placed in a wrap restraint. After talking to a mental health professional for about an hour, D.W. agreed to a strip search. While Marshall was conducting that search, a shank fell out of D.W.'s pants. Marshall described the shank as a thick object made out of a comb wrapped with twine which had a hook on one end and a sharp blade on the other.

Officer Dutra testified that before he responded to the second code call from Slay, he had already helped remove two shanks from D.W.'s room. Dutra also confirmed that

5

the officers had to use force because D.W. was resistant and noncompliant. Ultimately, Dutra assisted with putting D.W. in a full-body "wrap" restraint. While Dutra was securing the bottom half of the restraint, he heard D.W. make distinctive noises which Dutra immediately recognized as collecting spit in his throat. Dutra told D.W. not to spit. D.W. responded "I'm not going to spit on you, that would be disrespectful. I swallowed that shit." Dutra requested a "spit hood," but when one could not be found he proceeded to apply the top half of the restraint to D.W.'s body. As Dutra leaned in to secure the restraint, D.W. looked him in the eyes and "purposely spit" in his left eye. When questioned at the hearing about whether he experienced pain when D.W. spat in his eye, Dutra gave this response: "I wouldn't say pain, but it was irritated. It was irritated throughout the evening. It was red—but yeah, I wouldn't say painful."

Following the incident, Dutra was sent to the occupational hospital. He testified that hospital staff suspected a scratched cornea because "of all the irritation and redness," but a fluorescent fluid test established it was "just irritation." Dutra was also tested for STD's, and had to do follow up blood tests for several weeks because D.W's bodily fluid penetrated his eye. Dutra, who normally has perfect 20/20 vision, was also given a vision test which showed his vision was 20/25 and that his perception was blurry. Dutra testified that he was not directly exposed to the pepper spray that was released into D.W.'s room, but he believed that D.W. had pepper spray in his spittle which caused the irritation and burning sensation that he experienced in only his left eye. Dutra also testified that follow up testing for STD's is standard protocol for a detention officer who has direct exposure to bodily fluids.

Medical records pertaining to treatment Dutra received following the incident were admitted into evidence. According to a "Doctor's First Report of Injury," the examining doctor's "Impression" was that Dutra had suffered "Bodily fluid exposure to the left eye," and his treatment "Recommendation" was a baseline blood draw to test for communicable disease. According to the report, Dutra denied "any pain or discomfort," but complained of "mild tingling in his left eye because the suspect had a small amount of pepper spray in his mouth." Dutra's vision in each eye was 20/25 and his vision in

6

both eyes was 20/20 without glasses. The report also stated: "Evaluation of [Dutra's] left eye shows no erythema, edema, ecchymosis, or any deformity. Fluorescin stain was negative for foreign body and corneal abrasion. Conjunctiva is clear. There is no papilleredema."

Progress reports were prepared when Dutra returned to the hospital for follow-up blood work on March 25, May 13, and August 12, 2013. The lab results from Dutra's blood work were all negative for communicable diseases. On March 25, Dutra denied changes in his vision, or blurry or double vision, and the results of his vision exam were unchanged since February. On May 13, Dutra again denied any change in vision, blurry or double vision. By that time, his vision in each eye was 20/20. On August 12, Dutra's doctor completed a "Primary Treating Physician's Discharge Summary" which stated: "The patient is stable . . . He is in his pre-injury state with no impairment. No future medical treatment is needed."

### D. Jurisdiction and Disposition Orders

On December 23, 2013, the court sustained the count three charge that D.W. possessed a dirk or dagger. However, the court requested additional briefing with respect to the count four charge for battery with injury and continued the hearing until January 14.

On January 14, 2014, the juvenile court sustained the charge that D.W. committed a battery with injury on a peace officer. The court reasoned that if follow-up tests or visits had not been required, Dutra would probably not have suffered an "injury" within the meaning of the statute. However, the treatment plan that was adopted on February 12 included the baseline blood test, which supported a reasonable inference that medical treatment was actually necessary. Furthermore, the court found that language in the discharge summary stating that Dutra was in his "pre-injury" state and that no further treatment was required "clearly implie[d] that prior to that point medical treatment was needed or required."

The juvenile court also made disposition findings on January 14, 2014. By that time, D.W. had already been placed in YOTP pursuant to the petition that was pending

7

when the February 12 incident occurred.  The juvenile court continued the wardship and the YOTP placement, ordered D.W. to pay restitution, and imposed other conditions including a requirement that D.W. write a letter of apology to Dutra.  The court found that the maximum period of confinement was three years eight months and ordered D.W. to pay a $200 restitution fine within six months of his release from YOTP.

### III.

### DISCUSSION

#### A.  The Petition Amendment

D.W. contends the juvenile court erred by permitting the People to amend the wardship petition to allege the battery with injury charge.  We review the order authorizing the amendment for an abuse of discretion.  (See *In re Johnny R.* (1995) 33 Cal.App.4th 1579, 1584–1585 (*Johnny R.*); *In re Man J.* (1983) 149 Cal.App.3d 475, 481.)  Here, D.W. argues the court abused that discretion by depriving him of his due process right to adequate notice of the charges against him.

" '[Due] process requires that a minor, like an adult, have adequate notice of the charge so that he may intelligently prepare his defense.  [Citation.]'  [Citation.]  Compliance with this requirement has been held by the Supreme Court to mandate that the minor 'be notified, in writing, of the specific charge or factual allegations to be considered at the hearing, and that such written notice be given at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation.'  [Citation.]"  (*In re Robert G.* (1982) 31 Cal.3d 437, 442 (*Robert G.*).)

*Robert G.*, *supra*, 31 Cal.3d 437 involved a wardship petition which charged a 14-year-old minor with assault with a deadly weapon.  At the contested hearing, the People presented evidence that the minor threw two rocks while he was in a junior high school parking lot, one of which hit a school custodian in the back.  (*Id*. at p. 439.)  After the People completed their case, the minor moved for acquittal on the ground that the rock was not a deadly weapon.  The juvenile court denied the motion, although it agreed that the rock was not a deadly weapon.  (*Ibid*.)  After the minor rested without presenting evidence, the People argued that the petition should be sustained because the evidence

8

established that the minor committed a battery.  Over a defense objection, the juvenile court amended the petition to charge a battery and then sustained the petition pursuant to that new charge.  (*Id*. at p. 440.)  The *Robert G.* court reversed the judgment, holding that "a wardship petition under section 602 may not be sustained upon findings that the minor has committed an offense or offenses other than one specifically alleged in the petition or necessarily included within an alleged offense, unless the minor consents to a finding on the substituted charge."  (*Id*. at p. 445.)

Contrary to D.W.'s arguments on appeal, the amendment that occurred in this case did not violate the due process principles elucidated in *Robert G.*, *supra*, 31 Cal.3d 437.  Both offenses that D.W. was found to have committed were specifically alleged in writing in the second amended second supplemental petition that was served on D.W. on October 3, 2013.  Before the juvenile court accepted that version of the petition, it expressly confirmed that D.W. had received the October 3 notice of the proposed amendment.  And, after the amendment was made, D.W. was provided additional time to prepare to defend the new charge.  Indeed, the evidentiary hearing did not proceed until more than two months after the amendment was made.  Furthermore, the battery with injury charge was based on exactly the same conduct by D.W. which gave rise to the criminal charges in prior versions of the petition.  Under these circumstances, D.W. has failed to establish that his right to procedural due process was violated.

D.W. also mistakenly relies on *Johnny R.*, *supra*, 33 Cal.App.4th 1579.  In that case, a wardship petition charged the 12-year-old minor with assault with a deadly weapon.  (*Id*. at p. 1581.)  After the prosecutor completed a direct examination of the People's main witness, the court called counsel into chambers, advised the parties that an acquittal was likely because of the weak evidence, and suggested a plea bargain which would result in a finding that the minor committed the offense of possession of a dirk or dagger.  However the parties failed to reach a plea agreement.  (*Id*. at p. 1582.)  After the conference, the People sought leave to amend the petition to add a second charge for the weapon violation that the court had suggested in chambers and, over a defense objection, the court permitted that amendment.  (*Id*. at pp. 1582-1583.)  At the conclusion of the

9

trial, the court dismissed the assault charge, made a true finding with respect to the weapon possession charge, and sustained the petition on that ground.  (*Id*. at p. 1583.)

The *Johnny R*. court found that the juvenile court violated the mandate of *Robert G.*, *supra*, 31 Cal.3d 437, by permitting the prosecutor to amend the petition after the direct examination of its principal witness.  (*Johnny R.*, *supra*, 33 Cal.App.4th at pp. 1584–1585.)  The fact that the amendment occurred slightly earlier in the proceeding than the *Robert G.* amendment was not a meaningful distinction, the court reasoned, because the trial had "commenced and the minor had never been put on notice of a need to defend against the weapons charge."  (*Id*. at p. 1584.)  Furthermore, the appellate court concluded that the juvenile court abused its discretion by permitting a mid-trial amendment, after the court itself had pointed out the weakness of the People's case and supplied the idea for an alternative charge.  (*Id*. at pp. 1584–1585.)  In this regard, the *Johnny R.* court stated that "[p]rosecutorial inattention is not a sound basis for the court's exercise of discretion mid-trial to require the accused to face new charges not included within those previously filed."  (*Id*. at p. 1585.)

*Johnny R*., *supra*, 33 Cal.App.4th 1579, is distinguishable from the present case in material respects.  The amendment in this case was not authorized in the middle of a trial or in order to salvage a weak case.  Here, before any witness testified, the parties briefed and argued an issue of law which led the prosecutor to conclude that an amendment was necessary in order to properly address the conduct which gave rise to the supplemental petition.  Furthermore, D.W. received written notice of that amendment two months before the People presented evidence against him and nothing in the record suggests that D.W. needed more time to prepare his defense.  Thus, in contrast to *Johnny R*., the juvenile court in this case did not violate the mandate of *Robert G*., *supra*, 31 Cal.3d 437, or otherwise abuse its discretion by permitting the amendment adding the battery with injury charge.

**B. Injury**

D.W. contends the true finding that he committed battery with injury on a peace officer must be reversed because there is insufficient evidence to establish the injury element of that offense.

There are four statutory crimes of battery which are set forth and distinguished in sections 242 and 243. Section 242 defines simple battery as "any willful and unlawful use of force or violence upon the person of another." In determining whether a simple battery was committed, the word "violence" is superfluous because it " ' "has long been established" ' " that " ' " 'the least touching' may constitute a battery." ' " (*People v. Longoria* (1995) 34 Cal.App.4th 12, 16 (*Longoria*).) The second category of battery is felony battery which occurs when "the batterer not only uses unlawful force upon the victim" (*id*. at p. 16), but causes "serious bodily injury." (§ 243, subd. (d).)[5]

"The other two categories of battery involve a special class of victims: peace officers and other specified persons. (§ 243, subds. (b) and (c).) If what would otherwise be a simple battery (any unlawful touching, even without causing pain or injury) is committed against, e.g., a peace officer engaged in the performance of his/her duties, then the offense is punishable by one year in county jail and a $2,000 fine." (*Longoria*, *supra*, 34 Cal.App.4th at p. 16, italics omitted; see § 243, subd. (b).)

"Similarly, a distinction is made when it is a peace officer who is injured by a batterer. Unlike the ordinary victim, for enhanced punishment to be imposed, 'serious bodily injury' is not required." (*Longoria*, *supra*, 34 Cal.App.4th at p. 16.) Section 243, subdivision (c), provides that a battery is punishable by a $10,000 fine and up to three years in state prison when the battery is committed against a peace officer engaged in the performance of his or her duties (§ 243, subd. (c)(2)) and an "injury is inflicted on that

---

[5] Serious bodily injury is defined as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4).)

11

victim." (§ 243, subd. (c)(1).) "Injury" is defined as "any physical injury which requires professional medical treatment." (§ 243, subd. (f)(5).)

In this case, D.W. was charged with the fourth type of battery outlined above, violating section 243, subdivision (c) by committing a battery with injury on Officer Dutra. "What the statute prescribes as a qualifying injury is an injury which 'requires professional medical treatment.' It is the nature, extent, and seriousness of the injury— not the inclination or disinclination of the victim to seek medical treatment—which is determinative. A peace officer who obtains 'medical treatment' when none is required, has not sustained an 'injury' within the meaning of section 243, subdivision (c). And a peace officer who does not obtain 'medical treatment' when such treatment is required, has sustained an 'injury' within the meaning of section 243, subdivision (c). The test is objective and factual." (*Longoria*, *supra,* 34 Cal.App.4th at p. 17, italics omitted.)

Here, the juvenile court found that the medical record evidence supports an inference that Officer Dutra required professional medical treatment. However, the court's analysis was incomplete because the question is not just whether the victim required medical treatment, but whether he or she required medical treatment *for* a physical injury inflicted during the battery. (§ 243, subds. (c), (f)(5).) As discussed above, the inquiry requires an objective assessment of the facts regarding the "nature, extent, and seriousness" of that physical injury. (*Longoria*, *supra*, 34 Cal.App.4th at p. 17.)

As the juvenile court found, there is evidence that Dutra underwent a series of tests over a period of months to ensure that D.W. had not infected him with a communicable disease. Assuming those measures can be characterized as treatment, and that this treatment was required, it was not treatment for an actual physical injury. In other words, at most, there may be substantial evidence that Dutra required prophylactic professional treatment to determine if D.W.'s spittle had infected Dutra with a communicable disease. However, that treatment was independent from, and not causally related to, any actual injury Dutra received. Thus, the medical monitoring that Dutra received was not for an actual physical injury.

12

The People contend that Officer Dutra's testimony about the sensations he experienced after D.W. spat in his eye is more than sufficient to establish that he suffered an injury within the meaning of section 243, subdivision (c). Dutra testified that his eye was red and irritated but that he did not experience any pain as a result of D.W. spitting in his eye. The medical records reinforce Dutra's admission that he did not experience pain. Furthermore, there was no testimony or documentation in the medical records that a medical professional did anything to treat the redness or irritation in the officer's eye.

There is evidence that, before the altercation with D.W., Dutra had 20/20 vision and afterward his vision in each eye was 20/25 for a few months. However, this evidence of a temporary physical impairment is inconsistent with the juvenile court's finding that D.W. committed a battery with injury on a peace officer because it establishes that Dutra experienced decreased vision in *both* eyes, not just the eye D.W. spat in, and thus suggests that the symptoms that Dutra described were caused by his exposure to the pepper spray rather than by the spit in his eye.

The People mistakenly rely on *Longoria*, *supra*, 34 Cal.App.4th 12. In that case, appellant kicked an officer in the groin, fell on top of him, and pinned the officer's hand between his handcuffs and the floor. (*Id.* at p. 15.) After the altercation, the officer saw a doctor who directed him to have his hand x-rayed. At the hospital, another doctor "advised" the officer what to do about his groin and ordered an x-ray of his hand. There were no broken bones in the hand, but the officer sustained cuts to his fingers and the bottom of his hand which prevented him from holding his gun and, as a result of his injuries, he was placed on restrictive duty for three to five days. (*Id*. at pp. 15–16.) Based on this evidence, the *Longoria* court affirmed a jury finding that appellant violated section 243, subdivision (c). (*Id*. at p. 18.)

The People construe *Longoria*, *supra*, 34 Cal.App.4th at pages 17–18, as establishing a broad definition of "injury" which can be satisfied solely by the victim's testimony without scrutiny of the type of medical treatment that was actually rendered. We agree, but as discussed above, Officer Dutra's testimony in this case is insufficient to establish that he suffered the type of physical injury that requires professional medical

13

treatment. In this regard, the People simply mischaracterize the testimony by arguing that "Dutra's eye was flushed but that did not relieve the symptom of burning pain." Dutra testified that he did not experience any pain and he told the doctor the same thing.

In *Longoria,* the injury finding was supported by evidence that the officer "was kicked in the groin and knocked to his knees; the fingers and bottom side of his right hand were cut, and his hand was crushed; he could not hold his firearm and had difficulty unwrapping his holster; he was placed on restrictive phone-answering duty for three to five days." (*Longoria, supra*, 34 Cal.App.4th at p. 18.) No comparable evidence supports the injury finding in this case. Officer Dutra experienced redness and irritation without pain; he sought medical attention but tests showed that he suffered no injury to his eye; there was no evidence that he missed work or was placed on restricted duty. Dutra did experience a temporary reduction in vision but, as discussed above, that symptom could not have resulted from the battery because it affected both of the officer's eyes.

Although our analysis is necessarily fact specific, our conclusions are reinforced by *In re Michael P.* (1996) 50 Cal.App.4th 1525 (*Michael P.*). In that case, a probation department officer was attacked while he was driving appellant and several other wards to a youth center in a county van. (*Id*. at p. 1527.) Though handcuffed, appellant unbuckled his seatbelt, got up, leaned over and kicked the steering wheel of the van and the officer several times, causing the van to swerve back and forth. (*Id*. at pp. 1527–1528.) The officer slammed his brakes and came to a stop on the shoulder of the road, causing appellant to fly forward and hit the dashboard. (*Id.* at p. 1528.) Appellant, who was agitated, was eventually subdued and restrained. The officer who had been kicked several times in the chest and the chin later testified that he was sore after the incident, but he was not bruised and nobody took any photographs of the injuries. The officer did not file an incident report or seek medical treatment. (*Ibid*.)

The *Michael P.* court found that the officer's testimony that he suffered soreness but no bruising, without providing any information about how hard he was kicked, was insufficient to support a finding of battery with injury. (*Michael P.*, *supra*,

14

50 Cal.App.4th at p. 1529.) The court distinguished *Longoria*, *supra*, 34 Cal.App.4th 12, explaining that, although the injuries in that case may not have been so serious as to require medical attention, the officer "testified in detail about the seriousness of the injury," and the evidence established that the injuries required that he be placed on restricted duty for three to five days. (*Michael P.*, *supra*, at p. 1530.) These distinctions apply equally in this case, where Dutra's testimony established that he did not suffer any pain and where there is no evidence that he missed work or was placed on restricted duty because D.W. spat in his eye.

The *Michael P.* court acknowledged that "the threat of death and serious injury" that appellant created by almost causing a head-on car accident on the highway made his conduct "most reprehensible." (*Michael P.*, *supra*, 50 Cal.App.4th at p. 1529.) But, the court recognized, the "battery statute in question measures culpability by the seriousness of the inflicted injury," not by the reprehensibility of the batterer's conduct. (*Ibid.*) By the same token, the threat of infecting Officer Dutra with a communicable disease made D.W.'s conduct reprehensible. However, that threat is not relevant to our assessment of whether there was a qualifying injury. Dutra's testimony about the irritation in his eye is insufficient by itself to establish that he suffered a qualifying injury under section 243, subdivision (c).

The fact that section 243, subdivision (c), measures culpability by the seriousness of an inflicted injury rather than the reprehensibility of the batterer's conduct is, in our view, the reason that this statute was not properly used to hold D.W. accountable for his conduct during the February 12 incident. Indeed, it appears that the proper charge should have been that D.W. committed a battery by gassing upon a peace officer in violation of section 243.9; a crime that does not require a causal link between "injury" and "treatment" for that injury. (*Ante*, fn. 2.) As discussed in our factual summary, the juvenile court dismissed that count from the second amended petition after the People conceded that juvenile hall is not a "local detention facility" within the meaning of section 243.9. Six months after that dismissal, the Court of Appeal held in a case of first

15

impression that "the phrase 'any local detention facility' as used in section 243.9 includes juvenile halls." (*In re A.M.* (2014) 225 Cal.App.4th 1075, 1085.)

The parties agree that if the true finding on the section 243, subdivision (c) charge is not supported by the evidence, the proper remedy is to modify the disposition order to state that D.W. committed a violation of section 243, subdivision (b), simple battery on a peace officer. (See *Michael P.*, *supra*, 50 Cal.App.4th at p. 1530.) However, neither party addresses whether or how to recalculate D.W.'s maximum period of confinement. Therefore, we will remand this case to the trial court to address that issue.

## IV.

## DISPOSITION

The disposition order finding that D.W. committed a violation of section 243, subdivision (c) is modified to state that D.W. committed a violation of section 243, subdivision (b). This case is remanded for a determination whether the juvenile court's finding regarding D.W.'s maximum period of confinement requires adjustment.

_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
RIVERA, J.

A141217, *In re D.W.*

Trial court:           Contra Costa County Superior Court


Trial judge:           Hon. George V. Spanos


Counsel for Appellant:  Veneruso & Moncharsh, Leila H. Moncharsh, by appointment of the Court of Appeal under the First Appellate Project assisted-case system


Counsel for Respondent:  Office of the Attorney General, Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, and Eric D. Share, Supervising Deputy Attorney General


A141217, *In re D.W.*